IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CALVIN WILHITE,

    Plaintiff,

v.                        No. 09-2196 B

CORRECTIONS CORPORATION OF
AMERICA, et al.,

    Defendants.
_____

ORDER GRANTING MOTION OF DEFENDANTS CORRECTIONS CORPORATION OF
AMERICA, EASTERLING AND HARDEMAN COUNTY CORRECTIONAL
FACILITIES CORPORATION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION AND BACKGROUND*

On April 1, 2009, the Plaintiff, Calvin Wilhite, brought this action against the Defendants, Corrections Corporation of America ("CCA"); the State of Tennessee; Hardeman County Correctional Facilities Corporation ("HCCFC"); Joe Easterling, individually and in his official capacity as Warden of Hardeman County Correctional Facility ("HCCF"); Jermaine Hugeley; Jane Doe 1, Guard 1; Jane Doe 2, Guard 2; and Jane Doe 3, Guard 3 pursuant to 42 U.S.C. § 1983 and Tennessee law. Before the Court is the motion of Defendants CCA, Easterling and HCCFC (collectively, the "Movants") to dismiss the Plaintiff's claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

*STANDARD OF REVIEW*

Rule 12(b)(6) permits the Court to dismiss a complaint, or portions thereof, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to survive a Rule 12(b)(6) motion, the plaintiff "must allege facts that, if accepted as true, are sufficient 'to raise a right

to relief above the speculative level' and to 'state a claim to relief that is plausible on its face.'" Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  "And although [the Court] must accept all well-pleaded factual allegations in the complaint as true, [it] need not 'accept as true a legal conclusion couched as a factual allegation.'"  Hensley Mfg., 579 F.3d at 609 (quoting Twombly, 550 U.S. at 555, 127 S. Ct. 1955)).

In the instant case, the parties have submitted affidavits and other documents outside the pleadings for the Court's review.  "If, on a motion under Rule 12(b)(6) . . ., matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).

Rule 56 provides in pertinent part that a ". . . judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharm., Inc., 862 F.2d 597, 601 (6th Cir. 1988).  "The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Am. Civil Liberties Union of Ky. v. Grayson County, Ky., 591 F.3d 837, 843 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "The central issue is 'whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc., 588 F.3d 908, 915 (6th Cir. 2009), *reh'g & reh'g en banc denied* (Feb. 18, 2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

*FACTS*

The following facts are undisputed unless otherwise noted.  At the time the incidents from which this lawsuit arose occurred, Wilhite was an inmate at HCCF, located in Whiteville, Tennessee.  It is undisputed for purposes of this motion that he was injured during an assault by his cellmate, Defendant Hugeley, on or about November 9, 2007.  It is also undisputed for purposes of the instant motion that the Plaintiff was transported to the Regional Medical Center in Memphis, Tennessee for treatment the day of the beating.  Wilhite alleged in his complaint that he spent "months in hospitals, requiring numerous surgeries and physical therapy. [He] did not return to the facility until June of 2008 after spending over seven (7) months in hospitals."  (Compl. ¶ 31.)  According to the Movants, he was transferred to Nashville General Hospital in Nashville, Tennessee on or about November 17, 2007, from which Wilhite was released to the Deberry Special Needs Facility ("DSNF") on or about January 8, 2008.  The Plaintiff was discharged from DSNF's skilled nursing unit on April 2, 2008 and returned to HCCF in June 2008.  Wilhite averred in the complaint that, "[f]rom approximately November 8 or 9, 2007, the date of the incident, until the latter part of April 2008 or the early part of May 2008, Plaintiff Calvin Wilhite was not mentally competent, of sound mind, or aware of the events that conspired [sic] on or about November 8 or 9, 2007."  (Compl. ¶ 32.)

The Plaintiff alleges violation of the Fifth and Fourteenth Amendments to the United States

Constitution, as well as claims for failure to protect, failure to supervise, assault and battery, failure to maintain a safe environment and intentional infliction of emotional distress. Specifically, Wilhite maintains that the Defendants failed to protect him from Hugeley; failed to supervise guards to ensure they made appropriate rounds of the facility, during which they would have discovered the beating as it was occurring; failed to maintain a safe environment by permitting him to be savaged by another inmate and by not maintaining cell emergency buttons in good working order; and placing him in fear for his life.

*ARGUMENTS OF THE PARTIES AND ANALYSIS*

It is the position of the Movants that Plaintiff's claims against them, filed one year and five months after the altercation with Hugeley, are time-barred. "In all actions brought under § 1983 alleging a violation of civil rights or personal injuries, the state statute of limitations governing actions for personal injuries is to be applied. Tennessee's limitations period for actions brought under federal civil rights statutes or for personal injuries is one year." Arauz v. Bell, 307 F.App'x 923, 927 (6th Cir. 2009) (quoting Berndt v. Tenn., 796 F.2d 879, 883 (6th Cir. 1986)). In addition, claims for intentional infliction of emotional distress under Tennessee law are subject to a one-year statute of limitations. Bertrand v. Yellow Transp., Inc., ___ F. Supp. 2d ___, 2009 WL 3169822, at *6 (M.D. Tenn. Aug. 14, 2009), *report & recommendation adopted by* ___ F. Supp. 2d ___, 2009 WL 3169821 (M.D. Tenn. Sept. 30, 2009). "Federal law determines when the statute of limitations begins to run, and under federal law, 'the statute of limitations begins to run when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" Arauz, 307 F.App'x at 927-28 (quoting McCune v. City of Grand Rapids, 842 F.2d 903, 905 (6th Cir. 1988)).

In response, Wilhite submits that the statutory period should be tolled based on his

incompetence. Tolling principles are governed by state law. Dotson v. Lane, No. 08-4384, 2010 WL 22326, at *2 n.2 (6th Cir. Jan. 5, 2010). Tennessee Code Annotated § 28-1-106 provides that

> [i]f the person entitled to commence an action is, at the time the cause of action accrued, either within the age of eighteen (18) years, or of unsound mind, such person, or such person's representatives or privies, as the case may be, may commence the action, after the removal of such disability, within the time of limitation for the particular cause of action, unless it exceeds three (3) years, and in that case within three (3) years from the removal of such disability.

Thus, the statute "postpones the running of the statute of limitations for persons who are 'of unsound mind' when their cause of action accrues." Owen v. Summers, 97 S.W.3d 114, 124 (Tenn. Ct. App. 2001), *app. denied* (Oct. 7, 2002) (quoting Doe v. Coffee County Bd. of Educ., 852 S.W.2d 899 (Tenn. Ct. App. 1992)). Persons of unsound mind include those "incapable of attending to any business, or of taking care of [themselves]." Id. Tolling is appropriate where the plaintiff "shows that he is unable either to manage his personal affairs or to understand his legal rights and liabilities." Crawford v. Beatty, 108 S.W.3d 877, 880 (Tenn. Ct. App. 2003), *app. denied* (June 2, 2003) (quoting State v. Nix, 40 S.W.3d 459, 463 (Tenn. 2001)). "The plaintiff has the burden of proving he or she was of unsound mind at the time the cause of action accrued." Owens, 97 S.W.3d at 123. "[U]nsupported, conclusory, or general allegations of mental illness would not be sufficient, but the facts could be proved by family members[,] attorneys, or any other person who has knowledge of the facts that demonstrate the disabling condition." Crawford, 108 S.W.3d at 880 (citing Nix, 40 S.W.3d at 464) (internal quotation marks omitted). "The disability of unsound mind is removed when the individual is no longer of unsound mind, due either to a change in the individual's condition or the individual's death." Abels ex rel. Hunt v. Genie Indus., Inc., 202 S.W.3d 99, 105 (Tenn. 2006).

In addition to the allegations in his complaint, the Plaintiff has proffered his affidavit, in

which he asserts that he had no knowledge of the events surrounding the beating from the date of the injury to April 2008. (Aff. of Calvin Wilhite ("Wilhite Aff.") ¶ 3.) He learned the details of the incident upon his return to HCCF in June 2008. (Wilhite Aff. ¶ 4.)

For purposes of the pending motion, the Movants submit that, even assuming, arguendo, that Wilhite was incompetent in November and December 2007 during his hospitalization, he was no longer disabled under § 28-1-106 as of March 31, 2008, one year prior to the filing of his complaint. In support of their position, the Movants point to the deposition testimony of DSNF physicians Maduueze Nwozo and Amin Azimi.

Dr. Nwozo, Plaintiff's treating doctor and board-certified in internal medicine, reported that, as Wilhite's jaw was wired due to facial fractures when he arrived at DSNF, he was given a soft diet and pain medication. (Dep. of Maduueze Nwozo, M.D. ("Nwozo Dep.") at 8-9.) The Plaintiff was transported to the oral surgeon every two weeks to have the wires and the progress of healing evaluated. (Nwozo Dep. at 9.) On March 2, 2008, Wilhite signed a document indicating his refusal of the dental soft diet. (Nwozo Dep. at 23.) Inmates are allowed to sign the refusal document only after the doctor, in this case Dr. Nwozo, had explained the purpose of the treatment. (Nwozo Dep. at 23.) The physician recalled that Wilhite's jaw was still wired and he warned the Plaintiff hard food at that stage could cause choking. (Nwozo Dep. at 23.) Nonetheless, his patient insisted. (Nwozo Dep. at 23.) Dr. Nwozo was confident the Plaintiff understood his recommendation and the consequences of refusing that recommendation, and would not have allowed him to sign the form otherwise. (Nwozo Dep. at 23-25.) Wilhite had also refused the soft diet on February 25, 2008 and was given the same explanation, which Dr. Nwozo believed he understood, followed by his signature on a similar form. (Nwozo Dep. at 25-26.)

Nurses' notations reflected that, from March 23 to 29, 2008, Wilhite was alert and oriented at all times, feeding himself, able to take showers and perform self-care, able to go to the bathroom by himself and ambulatory. (Nwozo Dep. at 20-21.) In progress notes dated March 28, 2008, the doctor reported that Wilhite denied any new complaints; was alert and oriented to time, place and person; was in no acute distress; recognized Dr. Nwozo; and was able to comprehend what was going on around him. (Nwozo Dep. at 16, 29.) He was not on pain medication or otherwise "highly medicated" at that time. (Nwozo Dep. at 28-29.) The plan was to continue medical management and arrange physical and occupational therapy consultations. (Nwozo Dep. at 16.) By that point, his medical conditions were resolved. (Nwozo Dep. at 17.) Based on that assessment, Dr. Nwozo prepared a discharge summary on April 2, 2008 indicating that Wilhite was clear to return to the institution at which he was an inmate. (Nwozo Dep. at 10, 17.)

While he was waiting to be transferred back to prison, the Plaintiff was moved from the skilled nursing unit to a housing unit, since his medical condition was at that point stable. (Nwozo Dep. at 11-12.) At discharge, Wilhite was taking blood pressure medication. (Nwozo Dep. at 12.) No pain medication was noted on the discharge summary and Dr. Nwozo could not recall having him on pain medication at the time of discharge. (Nwozo Dep. at 12.) Dr. Nwozo testified that, when he was sent to the housing unit, the Plaintiff was alert and oriented, and able to understand the medical care he had received as well as the discharge instructions. (Nwozo Dep. at 13-14.) Wilhite did not appear to be confused during the doctor's explanation of the instructions. (Nwozo Dep. at 21-22.) He could also feed himself and take care of his personal needs. (Nwozo Dep. at 12-13.) While Dr. Nwozo acknowledged that sometimes all medications are not listed on the discharge summary, he testified at another point in his deposition upon a review of the Plaintiff's medical

7

records that blood pressure medication was the only pharmaceutical administered to Wilhite in March 2008. (Nwozo Dep. at 12, 27-28.)

Dr. Azimi is Director of Psychology at DSNF. (Dep. of Dr. Amin Azimi ("Azimi Dep.") at 5.) He performs screenings on patients at the facility approximately thirty days after their arrival and prepares reports on his conclusions. (Azimi Dep. at 6-7.) He described his screening of the Plaintiff[1] thusly:

> A: . . . [B]asically I will try to ask him how they are doing in terms of, you know, their mental health status, any problems, any concerns, anything like that. So if they have concerns and problems and they will -- I will document those things in writing -- in my writing, the details.
>
> But if somebody says I don't have a problem to discuss and all this stuff, so they have some routine questions. . . . I ask them, you know, about can you tell me where you are right now, what date is today, or I ask him about memory, you know, just how long have you been here. So just kind of screening-type of things I do with them briefly, see if there's any unusual things and then. Or, you know, just -- his perception may not be accurate, you know, they might say, you know, hearing voices or -- or being disturbed, you know, by nightmares or those kind of things.
>
> So I ask questions but actually did not -- they -- if they had answers, I mean, if they have concerns and then I'll put in my assessment right here, but if they say briefly no, I don't have or I don't exhibit any behavior that this could be significant that I could continue with them. And so that's what I do, you know, sometimes it takes about five minutes or four minutes, and sometimes takes half an hour or something, probably with this fellow this took probably five minutes or less.
>
> \*   \*   \*
>
> A: Because he mentioned that he has no problems to discuss, and he appeared to be fine, too.

---

[1] The report reflects that the screening occurred on January 7, 2008, one day before his admission date. In his deposition, Dr. Azimi stated that he might have inadvertently indicated the January date when it should have been February. (Azimi Dep. at 35-37.)

\*     \*     \*

> A:  I really don't know to specifically ask them why they're here in terms, excuse me, of their medical concerns because I know they are here because of medical concerns, so unless they talk to me about it. And my responsibility basically is to really see if they're okay in terms of their psychological well-being. And so that's why I ask questions, you know, so -- and I think he mentioned in this that he is happy that he's receiving proper treatment. And I think he's referring to his physical conditions.

(Azimi Dep. at 8-11.)

> A:  . . . I think he was laying down on his bed when I went to his room, and I asked him if I could talk to him.
>
>   What I talk to him is just really in the door, it's a little bit of a screened door. And so I talked to him through that, so I have not been inside his room or he's not -- he's not allowed to come to outside in a -- in a [sic] interviewing room, so I saw him through the door. And so I -- his affect was very proper with me and didn't exhibit any kind of tiredness in terms of, you know, mentally, his facial affect was very much intact, you know, in terms of that he was showing any kind of depression or anything like that in his face. And so energy-wise, he had quite a bit of energy and he was very alert. And so those kind of things were an indication that he -- his affect was appropriate.

(Azimi Dep. at 12-13 .) Dr. Azimi indicated that patients spent "99 percent" of the time in their rooms lying on the bed because there is nowhere for them to sit. (Azimi Dep. at 13.) He asked "do you know where you are, you know, do you know what day is today, how long have you been in here, do you know what's your date of birth, and how long you been [sic] in prison, where are you from, those types of things . . ." (Azimi Dep. at 15.) Wilhite "elaborated on that very accurately." (Azimi Dep. at 15.) The Plaintiff also exhibited no difficulty with memory or retrieving information for a short or long term. (Azimi Dep. at 16.)

Based on his conversation with Wilhite, Dr. Azimi concluded that he was cooperative, alert and orientated with appropriate affect and interaction as well as stable mood. (Azimi Dep. at 19-20.)

9

There was no indication of depression, anger, hostility, anxiety, hearing voices or suicidal thoughts/ideation. (Azimi Dep. at 20.) The psychologist considered the Plaintiff competent to carry on a conversation with him and, if he had noted difficulties or anything unusual, he would have followed up or scheduled a psychiatric evaluation to see if medication was needed. (Azimi Dep. at 21.) He did not believe either was necessary. (Azimi Dep. at 21-22.) Nor was it his opinion that any further mental treatment was required. (Azimi Dep. at 21-22.)

The psychologist had no conversations with Wilhite concerning the injuries that caused him to be at DSNF. (Azimi Dep. at 16.) He "strongly believed" the Plaintiff understood that he was receiving proper treatment. (Azimi Dep. at 19.) It was Dr. Azimi's impression that the Plaintiff was not interested in receiving counseling. (Azimi Dep. at 18-19.) The doctor could not recall whether Wilhite's face was bandaged at the time of the interview but recognized a photograph of him. (Azimi Dep. at 26.) He did not believe the Plaintiff's face was scarred. (Azimi Dep. at 27.)

Beyond the conclusory statements in his own affidavit, there is simply nothing in the record from which a trier of fact could conclude that Wilhite was unable to manage his own affairs or to understand his legal rights and liabilities. In order to toll the statute of limitations, the Plaintiff had to have been under a disability as of April 1, 2008, one year before the complaint was filed. Although Wilhite argues in his response to the dispositive motion that he was "unconscious" and "highly medicated" from the date of the injury through April 2008, the medical evidence contradicts this assertion. The testimony of neither of his physicians at DSNF supports a finding of disability after March 2008 and Wilhite has cited to no authority that one's mere presence in a treatment facility or the fact of a head injury equals disability under the Tennessee statute. The Plaintiff's unsupported statements that he was of unsound mind are insufficient. *See* Crawford, 108 S.W.3d

at 880, *supra.* Thus, he has failed to carry his burden of establishing that the statute of limitations should be tolled. *See* Owens, 97 S.W.3d at 123, *supra*.

## *CONCLUSION*

For the reasons set forth herein, the motion is GRANTED on the grounds the Plaintiff's claims against Defendants CCA, Easterling and HCCFC are time-barred.

IT IS SO ORDERED this 26th day of February 2010.

                                          s/ J. DANIEL BREEN
                                          UNITED STATES DISTRICT JUDGE